E-FILED
Thursday, 15 September, 2005  09:42:21 AM
Clerk, U.S. District Court, ILCD

# United States District Court

| CENTRAL | DISTRICT OF | ILLINOIS |

UNITED STATES OF AMERICA

v.

TROY POWERS

**CRIMINAL COMPLAINT**

CASE NUMBER: 05-3058-m

*FILED SEP 14 2005*
*JOHN M. WATERS, Clerk*
*U.S. DISTRICT COURT*
*CENTRAL DISTRICT OF ILLINOIS*

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __2004 through September 7, 2005__ in __Sangamon__ County, in the __Central__ District of __Illinois__ defendant:

knowingly and intentionally conspired to distribute
at least 5 or more kilograms of cocaine

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

I further state that I am a _____DEA Task Force Officer_____ and that this complaint is based on the following facts:
                                                Official Title

See attached affidavit

Continued on the attached sheet and made a part hereof:   ■ Yes   ☐ No

s/ George Tom Bonnett
Signature of Complainant

Sworn to before me and subscribed in my presence,

September 14, 2005  2:10 PM                at  Springfield, Illinois
Date                                            City and State

Byron G. Cudmore
U.S. Magistrate Judge                         s/ Byron G. Cudmore
Name & Title of Judicial Officer                 Signature of Judicial Officer

STATE OF ILLINOIS )
) ss
COUNTY OF SANGAMON )

## AFFIDAVIT

George Tom Bonnett, being first duly sworn, hereby deposes and states:

1  I am a Detective with the Springfield, IL Police Department, currently assigned as a Task Force Officer (TFO) with the Drug Enforcement Administration, Springfield, Illinois Resident Office (RO). I have been employed with the Springfield Police Department since December 1990 and have been a deputized Task Force Officer for approximately 4 years. I have received specialized training in various aspects of narcotics investigations, which include, but are not limited to, interviewing defendants and witnesses, surveillance techniques and money laundering. I have prepared numerous criminal affidavits, executed search warrants, and testified at criminal trials during my participation in numerous drug investigations.

2. This affidavit is made in support of an application for a Complaint charging TROY POWERS with conspiracy to distribute at least 5 or more kilograms of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A) and 846. A warrant for the arrest of Troy Powers is requested.

3. I am familiar with the following facts based upon my own personal observation, the observations of other law enforcement officers, and information officially furnished to me by other law enforcement officers, witnesses, and confidential sources. All references to cooperative sources (CS) will be in the feminine or male gender regardless of the actual gender of the CS.

4. On August 17, 2005, TFA Tom Bonnett was contacted by Illinois State Police Inspector Tom Maybury. Inspector Maybury advised that during an investigation of a domestic battery involving CS#1 (not yet a CS), approximately 554 grams of powder cocaine were seized. Inspector Maybury further advised that, based on historical interviews, he has identified CS#2 (not yet a CS) as a powder cocaine distributor in the Springfield, Illinois area and to be a close associate of CS#1.

5. On August 17, 2005, CS#1 was arrested for domestic battery. CS#1 cooperated with Inspector Maybury and identified Troy Powers as the source of supply of cocaine for CS#2. CS#1 further advised that on Saturday, August 13, 2005, Powers had dropped off the approximately 554 grams of powder cocaine and marijuana to CS#1 for CS#2.

6. On August 18, 2005, TFA Bonnett and Inspector Maybury met with CS#1, at the Springfield, IL Resident Office (SRO). CS#1 stated that CS#2 and

Troy Powers were selling large amounts of powder cocaine and marijuana to persons in the Springfield, Illinois area. CS#1 further stated that Powers supplies CS#2 with cocaine and marijuana.

7. CS#1 stated that in the last year CS#2 started getting cocaine and marijuana from Powers. During this time CS#2 was buying two ounces to one-half kilogram of powder cocaine from Powers every two weeks. CS#2 was paying $1,000 an ounce for the cocaine. CS#1 was not sure of the amounts of or price paid for the marijuana that CS#2 got from Powers. CS#1 stated that on Saturday, August 13, 2005, Troy Powers brought to CS#1's residence approximately one-half kilogram of powder cocaine and approximately one-half pound of marijuana. CS#1 was to keep the cocaine and marijuana for CS#2 until CS#2 was ready to sell the drugs. CS#1 stated that this was the third time since April 2005 that CS# 1 had stored cocaine and marijuana for CS#2. The first time was in April 2005, when Powers brought to CS#1's residence over 4 ounces of cocaine in a single Ziploc baggie. CS#1 stored the cocaine for CS#2 and CS#2 paid CS#1 $500 for keeping the cocaine at CS#1's residence. The second time was in May of 2005. This time CS#2 along with Shynele Powers brought over four ounces of powder cocaine for CS#1 to keep. Shynele Powers is the half sister to Troy Powers.

8. On August 18, 2005, agents from the DEA Springfield, IL Resident Office in conjunction with agents/officers from the Illinois State Police Central Illinois Enforcement Group, Springfield Police Department and Sangamon County Sheriff's Office formulated an operation in which CS#1 would arrange to speak with CS#2 regarding the approximately one-half kilogram of cocaine, which had been seized by officers on August 16, 2005 in Springfield, IL.

9. At approximately 7:15 p.m., TFO Bonnett and Inspector Maybury met with CS#1 at the Springfield RO to discuss the operation. Agents formulated an operation in which CS#1 would be supplied with a look-alike substance, which CS#1 would purport to CS#2 as being one-half kilogram of cocaine.

10. At approximately 8:20 p.m., agents traveled with CS#1 to a residence in Springfield. At the residence, CS#1 made recorded telephone calls to CS#2 to discuss the location of the one-half kilogram of cocaine. During one of the calls to CS#2, CS#1 indicated that he/she had the cocaine, and that CS#2 should obtain it at the location where CS#1 was located, and CS#2 agreed to meet with CS#1 at that location. Prior to the meeting, CS#1 was equipped with a digital recording device by TFA Bonnett. Agents also placed video/recording equipment in the residence and the meeting was recorded onto a mini-DVD video tape. CS#1 was then provided with a blue cooler, which contained two

plastic bags of a white powdery substance placed inside the cooler by TFO Bonnett, which CS#1 would later purport to CS#2 as being the one-half kilogram of cocaine.

11. At approximately 11:00 p.m., DEA Resident Agent in Charge (RAC), David Lenartowicz reported observing a maroon mini-van park in the driveway at the residence, and a white/male, later identified as CS#2 enter into the residence. Agents inside the residence, who were monitoring the video equipment, observed CS#1 meet with CS#2 in the living room. Also with CS#2 were two individuals (later identified as juveniles). The following is a summary of the conversation/actions between CS#1 and CS#2 as observed and heard by the agents:

When CS#2 entered the residence, CS#1 greeted her/him, and then handed CS#2 a blue cooler. CS#2 sat in a chair, and began to examine the contents of the cooler. While looking at the plastic bags, CS#2 told CS#1 that "this isn't the coke" and CS#1 indicated that that was what was in there, and CS#2 said "it's all powder dude." CS#2 asked CS#1 if it was "chunks" (consistency of the cocaine) and CS#1 indicated that something must have happened to it. CS#2, while looking at the white powder, told the CS#1 it was "baking soda" and CS#1 indicated that this was what was given to CS#1. CS#2

then said "this ain't coke, someone's changed it" and CS#1 began to look at the bags. CS#2 then began yelling at CS#1 that the substance was "flour" and again CS#1 indicated that it was what was given to CS#1. CS#2 can be seen pacing around the living room. Agents then heard a female's voice say, "Come on..., let's go." (The female was standing at the front door, not visible on the video). A short time later, agents, who were also located inside the residence, arrested CS#2 without incident. Agents outside the residence arrested the female in the driveway. All subjects were transported to the Springfield RO for processing.

12.   On August 18, 2005, SA Scott Giovannelli and Inspector Maybury met with a DEA confidential source (hereafter referred to as he/she or CS#2) at the Springfield, IL Resident Office (SRO) and conducted an initial debriefing of CS#2. CS#2 provided information related to cocaine trafficking in the Springfield, IL area. CS#2 was advised of her/his Miranda Warnings, signed and oral waiver and agreed to speak with agents.

13.   Special Agent Giovannelli first asked CS#2 about the events which had occurred earlier that evening. CS#2 stated that she/he was going to CS#1's house to meet with CS#1 and obtain some "stuff" (later clarified that this indicated cocaine) from CS#1. CS#2 indicated there should have been 16-18 ounces of cocaine in the package she/he was obtaining from CS#1. CS#2

indicated that the cocaine was really hers/his, and that CS#1 was just holding it for her/him. CS#2 stated that CS#1 had obtained the cocaine from CS#2's source of supply, identified by CS#2 as Troy Powers "last Friday or Saturday" (which would have been August 12th or 13th) and Powers told CS#2 how much cocaine was in the package. CS#2 stated that CS#1 had held cocaine for her/him on several other occasions. CS#2 stated that she/he had agreed to obtain the cocaine from Powers on a front (consignment), and the price for the one-half kilogram was $12,500.

14. CS#2 stated that she/he had obtained cocaine from Powers on numerous occasions in the past. CS#2 stated that the cellular telephone number she/he had for Powers was (217) 306-4620, that Powers lived on Laurel Street near Pope, in Springfield and that Powers was currently driving a white Nissan Armada. CS#2 also indicated that she/he was approached by Powers because they had known each other for several years and Powers had indicated that CS#2 could make money selling illegal drugs. CS#2 stated that in approximately January 2005, CS#2 first began receiving cocaine from Troy Powers. The first time CS#2 received cocaine from Powers, CS#2 received approximately one-quarter kilogram (9 ounces) for $6,500. CS#2 stated she/he sold the cocaine for approximately $900 per ounce. CS#2 stated that she/he had been receiving

cocaine from Powers on a fairly consistent basis since early 2005. CS#2 estimated that she/he received approximately 12-18 ounces of cocaine from Powers every two weeks, but CS#2 indicated there were a couple of times that she/he could not obtain cocaine from Powers. CS#2 stated that approximately two months prior to this interview she/he had received one kilogram of cocaine from Powers for approximately $24,000, and CS#2 stated that this was the most she/he had ever obtained from Powers at one time. CS#2 estimated that since early 2005, she/he had obtained at least seven to eight kilograms of cocaine from Powers for distribution. CS#2 indicated that she/he usually obtained cocaine from Powers on a front (consignment), and usually paid him back a few days later. CS#2 believed that Powers obtained cocaine from an unknown source of supply in the St. Louis, Missouri area. CS#2 stated that she/he had never made any trips with Powers, but she/he had heard Powers talking about the source on several occasions. CS#2 believed that Powers was obtaining up to ten kilograms at one time from the source in St. Louis. CS#2 stated that Powers utilizes several different vehicles to transport cocaine from St. Louis to Springfield. CS#2 indicated that Powers was somehow associated with the Harmony family, who owned a limousine business in Springfield, and also a used car lot. CS#2 indicated that Powers usually delivered illegal drugs to her/his residence, but

CS#2 said she/he had obtained cocaine from Powers' mother, identified as "Eddie," living on Brian Lane, Springfield, Illinois. CS#2 believed that Powers stored both illegal drugs and money at his mother's house.

15.  On August 19, 2005, agents from DEA, Springfield Police Department and the ISP/CIEG formulated an operation in which CS#2 would arrange a meeting with Troy Powers to discuss a drug debt owed by CS#2 to Powers for approximately one-half kilogram of cocaine.

16.  On August 19, 2005, at approximately 4:00 p.m., SA Giovannelli, TFO Bonnett and Inspector Maybury met with CS#2 near his/her residence in Springfield, Illinois. During this meeting, CS#2 was equipped with a digital video/recording device and a transmitter by SA Giovannelli. At approximately 4:15 p.m., CS#2 and TFO Bonnett went into CS#2's residence to attempt recorded telephone calls to Powers. The first recorded telephone call was made by CS#2 to Powers at telephone number (217) 306-4620 at approximately 4:27 p.m., but the call was not answered. At approximately 4:35 p.m., CS#2 received a telephone call from Powers (CS#2's caller ID indicated Powers) should come talk to him/her. Powers indicated that he would be at CS#2's residence shortly. Surveillance was established in the area of CS#2's residence.

17.  At approximately 5:35 p.m., CS#2 was instructed to make another call to Powers to ascertain his whereabouts (call not recorded). A short time later, CS#2 notified agents that he/she spoke with Powers and Powers had indicated he would be there shortly. Powers' telephone number of (217) 306-4620 and this call was recorded by TFO Bonnett. During the telephone conversation, CS#2 indicated Powers should come by CS#2's residence. Powers asked CS#2 if everything was in order (CS#2 later explained this referred to CS#2 having the money from the cocaine provided by Powers), and CS#2 indicated that Powers should come talk to him/her. Powers indicated that he would be at CS#2's residence shortly. Surveillance was established in the area of CS#2's residence.

18.  At approximately 5:35 p.m., CS#2 was instructed to make another call to Powers to ascertain his whereabouts (call not recorded). A short time later, CS#2 notified agents that he/she spoke with Powers and Powers had indicated he would be at CS#2's location shortly.

19.  At approximately 5:50 p.m., DEA Group Supervisor Roger Vernoy observed a maroon 1998 Lincoln Navigator parked near CS#2's residence, bearing Illinois registration 759 2606 (registered to Troy E. Powers, 1806 Brian Lane, Springfield, IL). Agents monitoring the transmitter could hear CS#2 speaking with Powers inside the residence. SA Giovannelli later reviewed the

conversation between CS#2 and Powers. The following is a summary of their conversation:

CS#2 indicated that Powers should come into the residence. CS#2 told Powers that he/she had half the money and dope, but indicated it was in CS#1's house, and there was an order of protection, at least until next Wednesday. CS#2 then explained to Powers the arrest of CS#1, and it would be next Wednesday before he/she could get into the house (where cocaine was supposed to be stored). CS#2 indicated he/she did not want to have to break-in (to obtain the cocaine). CS#2 indicated he/she only had "1 or 2 stacks" (referring to one-two thousand dollars). Powers indicated that CS#2 should not worry about it (not having the money for the one-half kilogram). Powers then talked on his cellular telephone. CS#2 again talked to Powers about CS#1, and asked Powers about his trip to Las Vegas. Powers indicated to CS#2 that he was playing in a concert later that day. CS#2 again indicated he/she had the stuff, but did not want to have to break-in to obtain the cocaine. Powers indicated that CS#2 should call him later.

20. At approximately 5:56 p.m., SA Giovannelli observed Powers depart the area of CS#2's residence in the Lincoln vehicle. Surveillance agents followed Powers. At approximately 6:05 p.m., Springfield Police Officer Sapetti reported

the Lincoln vehicle parked at 2266 East Laurel, Springfield, Illinois and surveillance was terminated. Also at this time, SA Giovannelli and TFO Bonnett retrieved the recording equipment from CS#2.

21.   On August 29, 2005, at approximately 5:00 p.m., TFA Tom Bonnett, SA Scott Giovannelli and Inspector Maybury met with (CS#2) at the Springfield, IL RO.

22.   CS#2 stated that Troy Powers came by CS#2's residence on August 28, 2005, at approximately 9:00 p.m. Powers asked CS#2 how things were going and wanted to know what was going on with CS#1. CS#2 lead Powers to believe that the cocaine and marijuana were still in the basement of CS#1's girlfriend's residence and that CS#1 couldn't get into the residence. Powers told CS#2 that he was out of cocaine right now and that he was waiting for CS#2 to pay him the money that CS#2 owed him before he could re-up (purchase more cocaine).

23.   Agents formulated a plan in which CS#2 would make a recorded telephone call to Powers and ask Powers to meet with CS#2 in person. CS#2 was going to talk to Powers about the money that CS#2 owed Powers for cocaine and marijuana that CS#2 obtained from Powers in the past. CS#2 would then ask Powers for more cocaine.

24.   At approximately 9:00 p.m., TFA Bonnett, SA Giovannelli and

Inspector Maybury met with CS#2 at a pre-arranged location. At approximately 9:12 p.m., CS#* made a recorded call to Troy Powers at (217) 306-4620. This call produced one cassette tape. During the call Powers asked CS#2 if CS#2 had anything (money) for him. CS#2 told Powers that he/she and CS#1 went to CS#1's girlfriend's residence but could not get into the residence. CS#2 asked Powers to give her/him more time and Powers agreed. Powers did not meet with CS#2 in person.

25. On September 6, 2005, SA Giovannelli, TFO Bonnett and ISP Inspector Maybury met with CS# 2 at the Springfield, IL Resident Office. During the meeting, CS#2 stated that he/she last spoke to Troy Powers on September 1, 2005 in Springfield, IL. CS#2 stated that during their short conversation, Powers wanted to know when CS#2 would be able to get money, owed by the CS#2 to Powers for one-half kilogram of cocaine. CS#2 indicated that he/she told Powers he/she did not have any money.

26. During this meeting, CS#2 was instructed to make a telephone call to Powers at (217) 306-4620. At approximately 1:30 p.m., CS#2 made the telephone call, recorded onto a cassette tape by SA Giovannelli. The following is a summary of the conversation between CS#2 and Powers:
When the call is answered, CS#2 asked to speak with "Troy," and Powers

indicated he was on the phone. CS#2 then indicated that "we should be cool by the time I get off tomorrow." (CS#2 later explained that this indicated that he/she would have money for Powers). Powers responded, "Thank God." CS#2 asked Powers if his "computer was working" (CS#2 had previously indicated this was how he/she inquired if Powers had cocaine for sale), and Powers indicated, "Yes, somewhat." CS#2 indicated he/she was on a lunch break and that he/she would call Powers around 1:00 p.m. the next day.

27. On September 7, 2005, agents from the DEA Springfield, IL Resident Office, in conjunction with agents/officers from the ISP CIEG Unit, Springfield Police Department and ATF Springfield formulated an operation in which DEA CS#2 would meet with Troy Powers and attempt to obtain cocaine from Powers. CS#2 had previously identified Powers as his/her cocaine source of supply, and that he/she was in debt to Powers for approximately $10,000 for one-half kilogram of cocaine.

28. At approximately 1:45 p.m., SA Giovannelli, TFO Bonnett, Inspector Rodney Boggs and Inspector Maybury met with CS#2 at his/her residence in Springfield, IL. Video recording equipment (Sony mini-DV) and a transmitter were placed in the residence. CS#2 was also equipped with a digital recorder. CS#2 indicated to agents that he/she had $2,000 of his/her own money, which

CS#2 wanted to use to make a partial payment of the $10,000 debt owed by CS#2 to Powers. At approximately 2:08 p.m., CS#2 was directed to make a recorded telephone call to Powers at (217) 306-4620. During this short conversation, CS#2 asked Powers if she/he could "come through" (referring to coming to the CS#2's residence). Powers confirmed that CS#2 was at home then indicated he would be right there. At approximately 2:09 p.m., surveillance units, which were in the area of Powers' residence 2266 E. Laurel, Springfield, observed a white Nissan Armada, bearing Illinois Dealer Registration 1312C (registered to J. Powers, LLC, 3347 South MacArthur, Springfield) depart the residence. At approximately 2:20 p.m., SA McGuire observed the Nissan in the area of CS#2's residence. At approximately 2:21 p.m., agents inside CS#2's residence observed (via the video transmitter) Powers enter and sit in the living room area with CS#2. During the conversation between CS#2 and Powers, they discussed not being able to obtain the one-half kilogram (which had been previously seized by agents) and that CS#2 wanted to give Powers some money (as partial payment on his/her debt). Agents monitoring observed CS#2 hand Powers $2,000 for the debt payment. CS#2 also indicated to Powers that he/she might be able to obtain some money for cocaine, and Powers indicated that CS#2 should call him when he/she had the money.

29.  At approximately 2:24 p.m., Powers exited CS#2's residence and agents followed Powers when he departed the area in the Nissan. At approximately 2:35 p.m., agents observed Powers park the Nissan on the street in front of 1806 Brian Lane, Springfield, Illinois (identified as Powers' mother's address) and enter into the residence.

30.  At approximately 2:45 p.m., agents instructed CS#2 to make another recorded telephone call to Powers at (217) 306-4620. During this conversation, CS#2 indicated to Powers that "he" (person CS#2 had told Powers that wanted to purchase cocaine) just left CS#2's residence and CS#2 had the money (for the cocaine). Powers said okay, and indicated he'd be right there. CS#2 was supplied with $3,000 ISP OAF by Inspector Maybury and $2,500 DEA OAF, which would be utilized to show Powers for the purchase of the cocaine. At approximately 2:45 p.m, Inspector Kim Cordery and ISP Sgt. Ken Guard, who were conducting surveillance at 1806 Brian Lane, observed a black male (subsequently identified as Powers) and a juvenile exit the 1806 Brain Lane location, enter a tan Hyundai, bearing Illinois registration KICKNU3 (registered to Yvonne Gilchrese, 1806 Brian Lane, Springfield, IL) and depart the area. Surveillance units observed the Hyundai north on Dirksen Drive from South Grand then lost sight of the vehicle.

31. At approximately 2:58 p.m., Powers and the juvenile were observed by agents (via the video transmitter) enter into CS#2's residence. SA Giovannelli observed Powers retrieve a plastic bag containing a white powder substance from his pocket and hand it to CS#2 while they were both in the living room area. Agents then observed CS#2 counting the money (ISP/DEA OAF) and then handing Powers the money, which was contained in a plastic bag. As Powers stood up from a chair in the living room, the agents located inside CS#2's residence took Powers into custody without incident. Powers and the juvenile were transported to the Springfield RO for processing. At CS#2's residence, TFO Bonnett took custody of the plastic bag, containing the apparent cocaine and later relinquished custody to SA Giovannelli at the Springfield RO for processing. SA Giovannelli subsequently conducted a presumptive field test for the presence of cocaine and the test produced positive results. Powers was processed and interviewed at the Springfield RO.

s/ George Tom Bonnett
George Tom Bonnett, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
this 14th day of September, 2005. 2:10 pm

s/ Byron G. Cudmore
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE